**HARRIS COUNTY BAIL BOND BOARD, International Fidelity Insurance Company, and Allegheny Casualty Company, Appellants,**

v.

**Carl R. PRUETT and National American Insurance Company d/b/a Allied Bonding Company, Appellees.**

No. 01–02–01043–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 10, 2005.

Bruce S. Powers, Assistant County Attorney, David Crump, Houston, Toni Hunter, Douglas M. Becker, Tommy L. Skaggs, Gray & Becker, P.C., Austin, for Appellants.

David A. Furlow, Thompson & Knight L.L.P, Houston, for Appellees.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

SHERRY RADACK, Chief Justice.

On this day, the Court considered the motions for rehearing filed by all parties.

We **OVERRULE** all motions for rehearing. However, we withdraw our opinion and judgment of October 14, 2004, and issue this opinion and judgment in its stead.

In this appeal, we consider the extent of (1) the rule-making authority granted to a local bail bond board and (2) the First Amendment protection afforded commercial speech. The Harris County Bail Bond Board ("the Board") and two insurance companies that issue bail bonds—International Fidelity Insurance Company and Allegheny Casualty Company—appeal from a summary judgment granted in favor of Carl R. Pruett, a bail bondsman, and National American Insurance Company d/b/a/ Allied Bonding Company, another insurance company that issues bail bonds. We decide whether (1) the Board had the power to pass two rules that attempt to control the solicitation of business by bonding companies and (2) the rules adopted by the Board are an unconstitutional restraint on the bonding companies' First Amendment rights. We affirm in part and reverse and render in part.

## BACKGROUND

### A. The Bail Bond Board Perceives a Problem

■ In the late 1990's, the Harris County Bail Bond Board[1] began receiving complaints from law enforcement officers, as well as citizens, about bail bond solicitation practices in the county. The Board perceived two specific areas of concern. First, the Board received complaints about bondmen contacting defendants with unexecuted warrants and "tipping [the defendants] off" that they would soon be arrested. These complaints raised concerns about defendants fleeing from arrest, officer safety, and victim safety, particularly in cases involving domestic violence. Second, the Board received complaints about bondmen conducting telephone solicitations during non-business hours. Some examples of these complaints included telephone solicitations made between the hours of midnight and 5 a.m. and repeated telephone calls during the first 24 hours after an arrest.

The Board, in 2000, asked bondsmen to refrain voluntarily from soliciting bond business before an arrest was made and during non-working hours. After attempts at voluntary compliance failed, the Board decided to address the issue by passing rules regarding the solicitation of bail bond business in Harris County.

### B. The Board Adopts Rules 24 and 25

On March 5, 2001, the Board enacted Rule 24[2], which prohibits solicitation of bail bond business from a person with an

---

1. Each county with a population of 110,000 or more must create a bail bond board. Tex. Occ.Code Ann. § 1704.051 (Vernon 2004). A county bail bond board is responsible for all aspects of the licensing of bondsmen in that county, including granting, denying, or renewing licenses. *Harris County Bail Bond Bd. v. Blackwood*, 41 S.W.3d 123, 124 (Tex. 2001).

2. Bail Bond Rule 24 provides in pertinent part:

No bondsman, agent, or employee of a bonding company, may make, cause to be made, or benefit from unsolicited contact, whether by verbal (including both in-person and by telephone), electronic, written or other means, made to solicit any bond business relating to a specific individual with an outstanding warrant that has not been executed. This rules does not apply to the solicitation of bail bond business arising from a warrant issued by a municipality and/or a Justice of the Peace. This rule

outstanding arrest warrant, and Rule 25,[3] which places certain time restrictions on the solicitation of bail bond business after an arrest has been made. Rule 24 (the unexecuted-warrant rule) creates an exception for municipal and Justice of the Peace warrants, because those warrants apply to Class C misdemeanors, offenses punishable by fine only. Rule 25 (the 24–hour rule) prohibits solicitation within the first 24 hours after arrest, and, after that time expires, prohibits unsolicited contact between the hours of 9 p.m. and 9 a.m. Monday through Saturday, and before noon on Sunday. Both Rule 24 and Rule 25 create an exception to the limitations on the solicitation of bail bond business if there is a prior or existing business relationship between the bondsman and the person requiring the bond.

## C. The Board Suspends Pruett's License

In late January 2002, the Board notified Pruett of a hearing on complaints against him for violating Rules 24 and 25. The first complaint alleged that Pruett violated Rule 25 by telephoning the complainant at 6:41 a.m. on the day after an arrest. The second complaint alleged that Pruett violated Rule 24 by calling a defendant with an outstanding arrest warrant, who then fled the area to avoid arrest.

At the Board hearing, Pruett acknowledged that he has violated Rules 24 and 25 and that he had instructed his employees to violate the rules as well. Accordingly, on February 13, 2002, the Board voted to sustain the complaints and suspended Pruett's bail bond license for 7 days on each complaint.

## D. Pruett Seeks and Obtains an Injunction

Pruett and National American Insurance Company d/b/a Allied Bonding Company (collectively, "Pruett") filed a petition seeking a declaratory judgment, temporary restraining order, and temporary and permanent injunction. International Fidelity Insurance Company and Allegheny Casualty Company (collectively, "International") intervened in the trial court in support of the local rules and of the Board's actions against Pruett. In April 2002, the trial court granted a temporary injunction in Pruett's favor.[4]

The parties filed cross-motions for summary judgment, and, on August 29, 2002, the trial court granted Pruett's motion and

does not apply to the solicitation of bail bond business if there is an existing business relationship between the bondsman and the individual requiring a bond.

3. Bail Bond Rule 25 provides in pertinent part:

No bondsman, agent, or employee of a bonding company, may make, cause to be made, or benefit from unsolicited verbal contact, including both in-person and by telephone, to solicit any bond business within 24 hours after the execution of an arrest warrant. Once the 24 hour period has lapsed, no bondman, agent, or employee of a bonding company, may make, cause to be made, or benefit from unsolicited contact, whether by verbal (including both in-person and by telephone), electronic, written or other means, to solicit any bond business that is made after 9:00 p.m. or before 9:00 a.m., Monday through Saturday, and after 9:00 p.m. or before 12:00 noon on Sunday. This rules does not apply to the solicitation of bail bond business if there is a prior or existing business relationship between the bondsman and the individual requiring a bond.

4. The Board and International filed an interlocutory appeal from the temporary injunction, which this Court dismissed as moot after the trial court issued a final judgment. *See Int'l Fid. Ins. Co. v. Pruett*, No. 01–02–00438–CV, 2002 WL 31839202 (Tex.App.-Houston [1st Dist.] Dec. 19, 2002, no pet.) (not designated for publication).

denied the Board and International's joint motion. The final judgment permanently enjoined the Board from (1) enforcing Rules 24 and 25, and (2) giving any effect to its order suspending Pruett's bail-bonding license. The judgment also severed the parties' claims for attorney's fees, thereby rendering the summary judgment final for purposes of appeal.

## PROPRIETY OF SUMMARY JUDGMENT

The Board and International appeal, contending that the trial court erred in granting summary judgment in Pruett's favor. In several, related points of error, the Board and International contend that (1) the Board possessed the power to issue Rules 24 and 25 and (2) Rules 24 & 25 do not unconstitutionally infringe on Pruett's free speech rights.

### A. Standard of Review

▪ The summary judgment rule provides a method of summarily ending a case that involves only a question of law and no fact issues. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985); *Robinson v. Budget Rent–A–Car Sys., Inc.,* 51 S.W.3d 425, 428 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *Cigna Ins. Co. v. Rubalcada,* 960 S.W.2d 408, 411 (Tex.App.-Houston [1st Dist.] 1998, no pet.). When, as here, both sides move for summary judgment, and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented. *Comm'rs Court v. Agan,* 940 S.W.2d 77, 81 (Tex.1997); *Rubalcada,* 960 S.W.2d at 411–12. We render such judgment as the trial court should have rendered. *Agan,* 940 S.W.2d at 81; *Rubalcada,* 960 S.W.2d at 411–12. The propriety of summary judg-

ment is a question of law; therefore, we review the trial court's decision de novo. *See Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). When a trial court's order granting summary judgment does not specify the grounds relied upon, we will affirm the summary judgment if any of the summary judgment grounds are meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex. 2000).

▪ Because this appeal requires us to interpret sections of the Occupation Code, we restate the basic principles of statutory construction. Interpreting statutes is a legal matter, subject to de novo review. *Bragg v. Edwards Aquifer Auth.,* 71 S.W.3d 729, 734 (Tex.2002). The overriding goal of statutory interpretation is to determine the legislature's intent. *Cont'l Cas. Co. v. Downs,* 81 S.W.3d 803, 805 (Tex.2002). In order to ascertain legislative intent, we first look to the plain and common meaning of the words used by the Legislature. Tex. Gov't Code Ann. § 311.011 (Vernon 1998 & Supp.2004); *Argonaut Ins. Co. v. Baker,* 87 S.W.3d 526, 529 (Tex.2002).

### B. Did the Board Act *Ultra Vires* in Adopting Rules 24 and 25?

Pruett argues that the Board did not have the power to adopt Rules 24 and 25, and that, in doing so, it acted *ultra vires.* Specifically, Pruett argues that (1) the Legislature did not give the Board the authority to regulate the solicitation of bail bonds until June 2001—six months after Rules 24 and 25 were passed; (2) Rules 24 and 25 were not authorized by law because they impose requirements relating to a bonding license that are different from, or in addition to, those in the Bail Bond Act;[5] (3) the rules do not involve regulating "the

---

5. *See* Tex. Occ.Code Ann. § 1704.001–1704.306 (Vernon 2004).

execution of a bail bond by a bail bond surety"; and (4) the rules violate the Open Records Act.[6] The Board argues that the trial court erred if it granted summary judgment on any of the above-referenced grounds. We address each issue accordingly.

### 1. Effect of the 2001 Legislative Amendments

■ In June 2001, after the Board adopted Rules 24 and 25, the Legislature passed section 1704.101 of the Bail Bond Act, which provides as follows:

(a) a board by rule may regulate solicitations or advertisements by or on behalf of bail bond sureties to protect:

(1) the public from:

(A) harassment;

(B) fraud;

(C) misrepresentation; or

(D) threats to public safety; or

(2) the safety of law enforcement officers.

(b) A bail bond surety, an agent of a corporate surety, or an employee of the surety or agent may not make, cause to be made, or benefit from unsolicited contact:

(1) through any means, including in person, by telephone, by electronic methods, or in writing, to solicit bonding business related to an individual with an outstanding arrest warrant that has not been executed, unless the bail bond surety or agent for a corporate surety has an existing bail bond on the individual; or

(2) in person or by telephone to solicit bonding business:

(A) that occurs between the hours of 9 p.m. and 9 a.m.; or

(B) within 24 hours after:

(i) the execution of an arrest warrant on the individual; or

(ii) an arrest without a warrant on the individual.

(c) This section does not apply to a solicitation or unsolicited contact related to a Class C misdemeanor.

TEX. OCC.CODE ANN. § 1704.109 (Vernon 2004).

Section 1704.109, which basically mirrors Rules 24 and 25, had not been enacted when the Board passed those rules. Pruett argues that the Legislature's passing section 1704.109 shows that it had *not* authorized the Board to regulate solicitation before September 1, 2001. Pruett's motion argues, "There was no reason for the Legislature to engage in the redundant, pointless act of enacting a statute granting boards power they already possessed."

We find, however, that the Legislature's subsequent act of providing specific authority to the Board to regulate bond solicitation is of little assistance in determining whether the Board possessed the authority to do so before the Legislature acted. *See Ervin v. State*, 991 S.W.2d 804, 816 (Tex. Crim.App.1999) (stating that "[a]lthough we have held that subsequent enactments by the Legislature may be some evidence of its intent in a prior version of the statute, we nevertheless give little weight to those subsequent enactments in interpreting the prior law."); *Bullock v. ABC Interstate Theatres, Inc.*, 557 S.W.2d 337, 340 (Tex.Civ.App.-Austin 1977, writ ref'd n.r.e.) (stating that "[l]egislative intent in the original enactment of a statute is not drawn from the size of the majority by which a subsequent Legislature amends or repeals the statute. What the Legislature intended originally is to be found in the language of the statute itself."). There-

---

6. *See* TEX. GOV'T CODE ANN. § 552.001–552.353 (Vernon 1994 and Supp.2004).

fore, we conclude that the fact that the Legislature saw fit to enact section 1704.109 to expressly give the Board the authority to regulate the solicitation of bail bonds does not determine whether the Board already possessed the power to do so.

As stated earlier, to ascertain legislative intent, we first look to the plain and common meaning of the words used by the Legislature. TEX. GOV'T CODE ANN. § 311.011 (Vernon 1998); *Argonaut*, 87 S.W.3d at 529. Therefore, to determine whether the Board possessed the power to enact Rules 24 and 25 in March 2001, we look to the statute that grants the Board's rule-making authority.

The rule-making authority of the Board is derived from section 1704.101 of the Bail Bond Act, which provides in part:

A board shall:

(1) exercise powers incidental or necessary to the administration of this chapter;

(3) supervise and regulate each phase of the bonding business in the county;

(4) adopt and post rules necessary to implement this chapter.

TEX. OCC.CODE ANN. § 1704.101(1), (3), (4) (Vernon 2004). Subsection (3) of section 1704.101 specifically states that bail bond boards shall "supervise and regulate each phase of the bonding business," and subsection (4) provides bail bond boards with the authority to "adopt and post rules" necessary to supervise and regulate the bonding business. Therefore, the Board adopted its rules with statutory authority.

### 2. *Do Rules 24 and 25 Impose Additional License Requirements?*

■ Pruett also argued, in his motion for summary judgment, that Rules 24 and 25 are *ultra vires* acts by the Board because they add to the license requirements established by the Bail Bond Act. In sup-

port, Pruett relies on a line of cases and an Attorney General opinion holding that county bail bond boards lack the authority to impose different or additional requirements for obtaining a bondsman's license.

In *Walstad v. Dallas County Bail Bond Bd.*, 996 S.W.2d 314, 315 (Tex.App.-Dallas 1999, no pet.), a bail bondsman filed suit, alleging that the bail bond board exceeded its authority by obtaining an independent appraisal of certain property that the bondsman had listed in support of her application to renew her license, even though the bondsman had complied with the Bail Bond Act requirement that she submit statements from taxing authorities that contained appraisals meeting certain standards. *Id.* at 315–16. The board argued that, because it had the authority to "regulate all phases of the bail bond business," it could require an independent appraisal. *Id.* at 316. The court disagreed, holding that "bail bond boards lack the authority to impose different or additional requirements for obtaining a bondsman's license." *Id.* at 317. Because the bondsman had submitted an appraisal that met the requirements listed in the Bail Bond Act, the board could not require that she obtain an independent appraisal. *Id.*

In ATTORNEY GENERAL OPINION No. JC–0366 (August 12, 2001), the Attorney General was also asked whether a county bail bond board could consider an independent appraisal on property executed in trust from bondsmen for purposes of determining their financial limit for executing bonds. The attorney general opined, "The board may not require the applicant to submit an independent appraisal of his or her real property, because it has no authority to impose requirements in addition to statutory requirements on applicants for licensure as bail bond sureties." *Id.; see also Tex. Fire & Cas. Co. v. Harris County Bail Bond Bd.*, 684 S.W.2d 177, 178–79

(Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding bail bond rule requiring $100,000 security deposit invalid because it imposed addition burdens on bail bond license applicants when statutory deposit required $5,000); *Bexar County Bail Bond Bd. v. Deckard,* 604 S.W.2d 214, 216–17 (Tex.Civ.App.-San Antonio 1980, no writ) (same).

We find these cases distinguishable. All of the cases cited above involve attempts by the boards to alter the licensing requirements specifically set forth in the Bail Bond Act. Our case, however, does not involve licensing requirements—it involves the Board's attempts to regulate how already-licensed bondsmen solicit business. As such, the present case is more like *Dallas County Bail Bond Bd. v. Stein,* 771 S.W.2d 577, 579–80 (Tex.App.-Dallas 1989, writ denied). In *Stein,* the board passed a rule that prohibited a licensed bondsman from employing an agent who was a convicted felon. *Id.* at 578–79. Stein, a convicted felon, filed suit to enjoin the board from interfering with his employment for a licensed bondsman by enforcing the rule. *Id.* at 579. The *Stein* court distinguished *Texas Fire & Casualty* and *Deckard* by stating:

> In each of these cases, the county boards had denied applications for licenses on the ground that the applicant failed to comply with certain local rules. Since the Bail Bond Act expressly sets forth the requirements for a license, these courts correctly reasoned that the local boards lacked authority to impose different or additional requirements. As Stein points out, however, the Bail Bond Act does not expressly set forth eligibility requirements for employees of licensees. Thus, such analysis is inapplicable to the present case.

*Id.* at 580. The *Stein* court also noted, "Where a statute expressly authorizes an agency to regulate an industry, it impliedly authorizes the agency to promulgate rules and regulations necessary to accomplish such purpose." *Id.* The court held that the board's "broad rule-making power *impliedly authorizes* the Board to supervise and regulate employees of bondsmen to the extent that such employees perform meaningful duties in the bonding business." *Id.* (emphasis added).

In *Black v. Dallas County Bail Bond Board,* 882 S.W.2d 434, 436 (Tex.App.-Dallas 1994, no writ), the board adopted a rule requiring bondsmen to pay all necessary and reasonable expenses incurred by the Sheriff's Department relating to the rearrest of a defendant whose bond had been forfeited. Black, a bondsman, filed suit, alleging that the board had exceeded its rule-making authority because the Legislature had deleted from the Bail Bond Act a provision that expressly made a bondsman's failure to pay rearrest costs a grounds for the suspension of his license. *Id.* at 438. Black argued that the change in the statute preempted the board's authority to adopt the rearrest rule. *Id.* The *Black* court held that "[t]he broad grant of authority to supervise and regulate all phases of the bonding business impliedly authorizes the Board to enact rules on any phase of the business." *Id.* at 439.

We agree with the courts in *Black* and *Stein.* The Bail Bond Act gives the Board the broad power to "supervise and regulate each phase of the bonding business" and to "adopt and post rules necessary to implement [the Bail Bond Act]." TEX. OCC. CODE ANN. § 1704.101(3), (4) (Vernon 2004). Rules 24 and 25 do not add to or alter the licensing provisions of the Bail Bond Act. Therefore, we conclude that the board did not exceed its broad rule-making authority by adopting Rules 24 and 25.

### 3. Do the Rules 24 and 25 regulate "the execution of a bail bond by a bail bond surety"?

█ Pruett also alleges that the Board acted *ultra vires* in passing Rules 24 and 25 because, in 1999, the Legislature altered the definition of a "bonding business," thereby narrowing the Board's power to regulate the bonding business. Before 1999, the Bail Bond Act defined "bonding business" as "the occupation in which a bondsman is engaged." Act of May 26, 1981, 67th Leg., R.S., ch. 312 § 2, 1981 Tex. Gen. Laws 875, 876 (since amended) (current version at TEX. OCC. CODE ANN. § 1704.001(4) (Vernon 2004)). When the Occupations Code was codified in 1999, the statute was changed to define a "bonding business" as "the execution of a bail bond by a bail bond surety." Act of May 10, 1999, 76th Leg., R.S., ch. 388 § 1, 1999 Tex. Gen. Laws 1431, 2279 (since amended) (current version at TEX. OCC. CODE ANN. § 1704.001(4) (Vernon 2004)).[7] Therefore, Pruett argues that, when Rules 24 and 25 were passed, the Board had only the power to regulate the actual execution of a bail bond, not the solicitation of a bail bond.

We disagree. The Board was authorized, then and today, to "supervise and regulate *each phase* of the bonding business in the county." TEX. OCC.CODE ANN. § 1704.101(3) (Vernon 2004) (emphasis added). To paraphrase, using the 1999 definition of "bonding business"—the Board was authorized to supervise and regulate "each phase of the execution of a bail bond by a bail bond surety" in the county. We hold that the power to regulate *each phase* of the execution of a bail bond includes the power to regulate the solicitation of a bail bond, a necessary first step in the execution of a bail bond.

### 4. Do the rules violate the Open Records Act?

█ Finally, Pruett argues that the Board acted *ultra vires* in passing Rules 24 and 25 because the rules violated the Texas Open Records Act. *See* TEX. GOV'T CODE ANN. § 552.001–552.353 (Vernon 1994 and Supp.2004). Pruett's motion cites the public policy set forth in section 552.001(a) of the Open Records Act, which provides as follows:

> Under the fundamental philosophy of the American constitutional form of representative government that adheres to the principle that government is the servant and not the master of the people, it is the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created. The provisions of this chapter shall be liberally construed to implement this policy.

TEX. GOV'T CODE ANN. § 552.001(a) (Vernon 1994 and Supp.2004). In his appellate brief, Pruett argues, "This Board violates this statute by enforcing the rules *to keep the public from obtaining access,* through bondsmen, to public-record jail-inmate and open-warrants information." (Emphasis added).

---

**7.** We note that, effective June 20, 2003, the definition of "bonding business" was again changed to mean "the solicitation, negotia- tion, or execution of a bail bond by a bail bond surety." TEX. OCC.CODE ANN. § 1704.001(4) (Vernon 2004).

Pruett, however, lacks standing necessary to make such a claim. Rules 24 and 25 do not prohibit *Pruett* from obtaining access to public information, and Pruett does not contend that *he* has been denied access to public information. Instead, Pruett contends that *the general public* has been prevented from receiving information that he wishes to disseminate. Because Pruett has not been denied access to public information, he has no standing to complain that Rules 24 and 25 violate the Open Records Act. *See Hunt v. Bass,* 664 S.W.2d 323, 324 (Tex.1984) (stating that standing consists of some interest peculiar to person as individual and not as member of general public).

Accordingly, we hold that the Board did not act *ultra vires* when it enacted Rules 24 and 25.

### C. Are Rules 24 and 25 Unconstitutional?

▉▉▉ In his motion for summary judgment, Pruett contends that, even if Rules 24 and 25 were not *ultra vires* acts, they are unconstitutional prior restraints on free speech.[8] In two issues, the Board contends that the trial court erred by concluding that Rules 24 and 25 are unconsti-

tutional prior restraints on free speech.[9] The Board argues that Rules 24 and 25 meet the constitutional requirements for commercial speech, as set forth by the United States Supreme Court in the *Central Hudson* test. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

▉▉▉ *Central Hudson* provides a four-part analysis for determining the validity of restrictions on commercial speech: (1) whether the speech is concerning a lawful activity and is not misleading; (2) whether the restriction seeks to implement a substantial governmental interest; (3) whether the restriction directly advances the governmental interest; and (4) whether the restriction reaches no further than necessary to accomplish the objective. *See id.* at 566, 100 S.Ct. at 2351. Under the *Central Hudson* test, the Board bears the burden of justifying the challenged restriction as furthering its substantial interest. *See Greater New Orleans Broadcasting Ass'n, Inc. v. United States,* 527 U.S. 173, 183, 119 S.Ct. 1923, 1930, 144 L.Ed.2d 161 (1999).

### 1. Rule 24—The Open Warrants Rule

8. Pruett also argues that Rules 24 & 25 violate his Eighth and Fourteenth Amendment rights because they are unconstitutionally vague. However, only one full page of his 50 page brief addresses this claim, in which he conclusively states that "[a]ppellees have to *guess* about the meaning of the words [of the rules] when their clients' freedom and their licenses are at stake." However, he provides no case law analysis to assist this Court in determining why or how the rules are unconstitutionally vague. Accordingly, we do not address this issue as it is inadequately briefed. *See* TEX.R.APP. P. 38.1(h).

9. Pruett raises both federal and state free speech claims. We recognize that the supreme court has suggested that the Texas free-speech clause may be "broader" in some

respects than its federal counterpart. *See Ex parte Tucci,* 859 S.W.2d 1, 5 (Tex.1993); *Davenport v. Garcia,* 834 S.W.2d 4, 10 (Tex.1992). But, the court has also held that unless a party can show through the text, history, and purpose of article I, section 8, that the state constitution affords more protections than the First Amendment in regard to that case, courts should assume that free speech protections are the same under both constitutions. *See Texas Dept. of Transp. v. Barber,* 111 S.W.3d 86, 106 (Tex.2003). Pruett has not articulated any reason why the Texas free speech clause would be more protective of his rights than the First Amendment. Accordingly, we address Pruett's free speech claims under the First Amendment body of jurisprudence.

■ As noted earlier, the open warrants rule prohibits bondsmen from soliciting bond business from an individual with an outstanding warrant. The rule does not apply to solicitations if there is an "existing business relationship" between the bondsman and the individual requiring the bond. We consider whether this rule is constitutional under the *Central Hudson* test.

### (a) whether the speech is lawful and not misleading

Rule 24 meets the requirement of the first prong of *Central Hudson* because soliciting bail bond sales from people with outstanding warrants is a lawful activity, and there is no allegation that the information provided by Pruett was misleading.

### (b) whether there is a substantial governmental interest

The Board asserts that Rule 24 was designed to ensure the safety of police officers and the public. The Board argues that prohibiting the solicitation of bonds from people with outstanding warrants will prevent bondmen from "tipping off" defendants that they are soon to be arrested. Such action, the Board argues, will reduce the risk of flight by defendants and will diminish the risk of harm to arresting officers and complainants. Pruett responds that the only interest advanced by the Board is "killing competition" in the bond industry by restricting the speech of bondsmen who solicit business in this manner. While it is true that decreased competition may result from the rules enacted by the Board, such a factor does not automatically negate the substantial interest advanced by the Board. Therefore, we hold that the Board has articulated "substantial government interest" in support of Rule 24, i.e., the safety of arresting officers and complainants in criminal cases. *See, e.g., Morales v. Ellen,* 840 S.W.2d 519, 525–26 (Tex.App.-El Paso 1992, writ de-

nied) (holding that law enforcement exemption to Open Records Act excludes disclosure of information that, if revealed, "might endanger the life or physical safety of law enforcement personnel, or interfere with law enforcement and crime prevention").

### (c) whether the restriction advances the government interest

■ Under *Central Hudson,* the Board has the burden of showing that its regulation directly and materially advances the aforementioned interests. "Mere speculation or conjecture" will not satisfy that burden; "rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane,* 507 U.S. 761, 770, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993). A regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350.

Pruett contends that Rule 24 is "too underinclusive and filled with competition-killing exemptions to directly advance the Board's stated goals." As to Rule 24, we disagree. The Board presented the testimony of numerous peace officers, all of whom agreed that the element of surprise was important in executing an arrest warrant. Detective B. Harwell testified that he did not want suspects to know that he was coming to execute a warrant because "[o]ur safety is involved when the individual is aware that there is a warrant for their arrest and we are going to come get him." Harwell also testified that "[a]nytime you contact [a defendant] to notify him that I want to solicit your business as an attorney or as a bondsman, you risk my life." Sergeant B. Carr testified, "Certainly on

[Rule] 24, on the officer safety, having done that for 13 years personally on the street myself, I don't want anybody to know I am coming. It's that element of surprise, not only for my safety, but the defendant, as well as anybody that's around the defendant." Officer S. Ballard, an officer in the child-abuse unit of the police department, testified that if child-abuse defendants know that an arrest is imminent, it "poses a risk to the child if the child is still in the home with the offender, or if he knows where CPS has placed them, or if the child is with a relative placement, he would also have access to the child." In sum, all of the peace officers' testimony presented at the hearing supported the position that Rule 24 was helpful in maintaining the element of surprise when making an arrest on an open warrant and in protecting both the officers and victims against the risk of physical injury by the person subject to arrest.

However, many of the officers testified that Rule 24 did not go far enough, because it exempts from compliance bondsmen having "existing business relationships" with those individuals requiring a bond. Pruett argues that the "existing business relationship" exemption is so broad that, in effect, the exception swallows the rule, thereby providing only ineffective or remote support for the Board's stated purpose. To properly address this contention we first define "existing business relationship."

At oral argument, the Board argued that "existing business relationship" means that the bondsman involved has in place an existing, current bond on the person requiring another bond. We agree. The existence of a current relationship based on an existing bond is the reasonable interpretation to be given to the phrase, especially when contrasted with the phrase *"prior or* existing business relationship" used in Rule 25.[10] Furthermore, this definition is in accord with the newly-enacted section 1704.109 of the Texas Occupations Code, which allows bondsmen with "an existing bail bond on [an] individual" to solicit bonding business from that individual even though there is an outstanding arrest warrant that has not been executed. *See* TEX. OCC.CODE ANN. § 1704.109 (Vernon 2004).

Having decided that the term "existing business relationship," as that term is used in Rule 24, refers to the relationship between a bondsman and an individual for whom the bondsman has provided a current, existing bond, we next decide whether the exclusion of such bondsmen from the solicitation prohibition of Rule 24 makes the rule ineffective.

Pruett argues that bondsmen are more likely to have "an existing-business-relationship" with a repeat offender, and that repeat offenders are more likely to endanger law enforcement officers upon learning of a pending warrant than first-time offenders. In other words, Pruett argues that allowing the solicitation of those al-

---

10. Cases involving the construction of statutes are helpful in interpreting the rules at issue in this case. *See Chastain v. Koonce,* 700 S.W.2d 579, 582 (Tex.1985) (holding that "every word of a statute was used for a purpose and every word in that statute must be given effect if possible"); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981) (stating that "every word excluded from a statute must also be presumed to have been excluded for a purpose"). Rule 24 excludes bondsmen with "existing business relationships" and Rule 25 excludes bondmen with "prior or existing business relationships." Thus, we conclude that the reasonable explanation for the difference is that "existing business relationship" means the relationship between a bondmen and an individual with a current, existing bond, while "prior business relationship" is broader, and includes the relationship between a bondsman and anyone for whom he has provided a bond in the past.

ready out on a bond actually increases the risk of injury to officers.

Although a rule with no exceptions might provide *even more* safety to police officers, we do not believe that the exception in Rule 24 "swallows the rule." There are legitimate and valid reasons to exclude bondsmen with *existing bonds* on defendants from the rule prohibiting the solicitation of bonds from individuals with unexecuted warrants. For example, a bondsman with an existing bond on a defendant would likely have reason to call the defendant upon learning of the existence of an unexecuted warrant, as the commission of a new offense could likely effect the existing bond. It is impractical to allow the bondsman to discuss an existing bond, but to prohibit him from discussing the possibility of acting as a bondsman on the new offense. Furthermore, a bondsman with an existing bond on a defendant has no incentive to call a defendant whom he believed would flee or resist arrest, because such action by the defendant could cause a forfeiture of the original bond.

Therefore, we conclude that Rule 24 directly advances the Board's interests in preventing defendants from fleeing and in protecting those involved in the arrest process, despite the existence of an exception to the rule for bondsmen with "existing business relationships" with defendants. Accordingly, we conclude that prong three of the *Central Hudson* test has been met.

**(d) whether the restriction reaches no further than necessary**

 Pruett contends that the Board has not satisfied the fourth element of *Central Hudson* because, according to Pruett, there are other, less restrictive, means by which the Board could address its concerns about offender flight and officer safety. However, the Board "is not required to employ the least restrictive

means conceivable, but must demonstrate narrow tailoring of the challenged regulation to the asserted interest—'a fit that is not necessarily perfect, but reasonable.'" *Greater New Orleans Broadcasting,* 527 U.S. at 188, 119 S.Ct. at 1932 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989)). Under the fourth prong of the *Central Hudson* test, the Board is required to show that the regulation reaches no further than necessary to accomplish its objective. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 507, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981).

Pruett argues that Rule 24 "is clearly overbroad with respect to Appellees' calls to the tens of thousands of citizens with open warrants who receive letters from the Sheriff suggesting that they post bond." Essentially, Pruett is arguing that the Rule 24 does not alleviate the problem of offender flight and officer safety because it regulates only solicitation by bondsmen and does not address *other groups* of people that might "tip off" defendants, such as the Sheriff's Department and attorneys.

This Court addressed a similar argument in *Eller Media v. City of Houston,* 101 S.W.3d 668 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In *Eller Media,* a billboard company argued that a Houston city ordinance prohibiting the construction of new, off-premises billboards failed prong four of the *Central Hudson* test because the removal of off-premises signs would not make a "significant improvement" in the appearance of Houston given that the ordinance did not address the issue of on-premises signs. *Id.* at 677. This Court noted that the government can make different regulations for off- and on-premises signs because there are different

considerations behind their functions. *Id.* Citing *Metromedia v. City of San Diego,* we concluded that the City had satisfied the fourth prong of *Central Hudson. Id.* at 678. In *Metromedia,* the United States Supreme Court also addressed a billboard ordinance that contained exceptions for some on-site advertising. In holding that the ordinance met the fourth prong of the *Central Hudson* test, the Court stated:

> If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows on-site advertising and some other specifically exempted signs.

453 U.S. at 508, 101 S.Ct. at 2893.

In this case, the Board has a sufficient basis for believing that bondsmen who solicit business from individuals with unexecuted warrants contribute to offender flight and put police officers and victims at risk. Even though Rule 24 may not fully accomplish its goal of preventing offender flight and increasing officer/victim safety in connection with arrests because it regulates only solicitation by bondsmen, we conclude that, like the billboard ordinances in *Eller Media* and *Metromedia,* it goes no further than necessary in seeking to accomplish its goal. Rule 24 does not prohibit commercial speech, it merely postpones it until after an arrest warrant has been executed. *See Anderson Courier Serv. v. State,* 104 S.W.3d 121, 125–26 (Tex.App.-Austin 2003) (holding prohibition on use of accident reports for personal gain failed *Central Hudson* test because not limited in time).

We conclude that Rule 24 is not an unconstitutional restriction on commercial speech. Accordingly, we sustain the Board's issue relating to the constitutionality of Rule 24.

**2. Rule 25—The 24–Hour Rule**

As noted earlier, the 24–hour rule contains two components. First, the rule prohibits all solicitation within 24 hours after the execution of an arrest warrant. Second, after 24 hours have expired, the rule prohibits all calls made during non-business hours. Both components of Rule 25 contain an exception for bondsmen who have "prior or existing business relationships" with the person requiring a bond.

**(a) Solicitation prohibited during non-business hours**

■ Rule 25 provides that, once 24 hours have elapsed from the execution of an arrest warrant, no bondsman may solicit bond business after 9 p.m. or before 9 a.m., Monday through Saturday, or before 12 noon on Sunday. The Board argues that this component of Rule 25 does not attempt to regulate constitutionally protected commercial speech. We agree.

■ The first prong of *Central Hudson* requires that the speech at issue concern a "lawful activity" and not be misleading. 447 U.S. at 566, 100 S.Ct. at 2351. The government may freely regulate commercial speech that concerns unlawful activity or is misleading. *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 623–34, 115 S.Ct. 2371–2376, 132 L.Ed.2d 541 (1995).

Texas law already prohibits telephonic solicitation before noon or after 9 p.m. on Sunday, and between the hours of 9 p.m. and 9 a.m., Monday through Saturday. *See* TEX. BUS. & COM.CODE ANN. § 37.02(a)(2) (Vernon 2002 and Supp.2004). As such,

the Board may "freely regulate" solicitation by bondsmen during these hours.

Accordingly, we sustain the Board's issue relating to the portion of Rule 25 that prohibits solicitation during non-business hours.

### (b) Solicitation prohibited during first 24 hours post-arrest

■ Rule 25 also provides that bondsmen may not solicit bond sales at any time during the first 24 hours after an arrest. The rule provides an exception for bondmen with "prior or existing business relationships" with the individual requiring a bond. We consider whether this rule is constitutional under the *Central Hudson* test.

### (i) whether the speech is lawful and not misleading

Rule 25 meets the requirement of the first prong of *Central Hudson* because soliciting bail bond sales from people within 24 hours of their arrest is lawful, and there is no allegation that the information provided by Pruett was misleading.

### (ii) whether there is a substantial governmental interest

The Board presented evidence that Rule 25 is designed to prohibit "undue harassment and solicitation of the general citizenry beyond normal business hours that other telephone solicitors could use." The blanket prohibition during the first 24 hours after arrest is necessary, according to the Board, because "[i]t is during the initial 24 hours after arrest that the greatest solicitation abuse occurs." The Board presented evidence of citizen complaints about repetitive telephone calls ("20 to 40 calls") during the first 24 hours after arrest. The Board was also concerned about the "professional image of bondsmen."

■ The Supreme Court has held that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2295–96, 65 L.Ed.2d 263 (1980). Furthermore, "[s]tates have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public, health, safety, and other valid interests[,] they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb. v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.Ed.2d 572 (1975).

Thus, we conclude that the Board has shown a substantial government interest in enacting the solicitation ban during the first 24 hours after arrest.

### (iii) whether the restriction advances the government interest and reaches no further than necessary

We next consider whether the ban on bond solicitation during the first 24 hours post-arrest meets the third and fourth prongs of the *Central Hudson* test. The third prong of the *Central Hudson* tests asks whether the speech restriction directly and materially advances the government interest. *Greater New Orleans Broadcasting,* 527 U.S. at 188, 119 S.Ct. at 1932. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane,* 507 U.S. at 770–71, 113 S.Ct. at 1800. Consequently, "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2343. The fourth prong of the *Central Hudson* test "compliments the direct advancement in-

quiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans Broadcasting,* 527 U.S. at 188, 119 S.Ct. at 1932.

Pruett again argues that Rule 25 fails to meet prongs three and four because its exception "swallows the rule," thus making it ineffective to support the Board's purpose. As to this part of Rule 25, we agree. We begin by noting that the exception in Rule 25 is much broader than that in Rule 24. While the exception in Rule 24 applies only to a bondsman with an *existing* bond on an individual requiring a bond, the exception in Rule 25 applies to a bondsman with a *"prior or* existing business relationship" with an individual requiring a bond. (Emphasis added). As such, Rule 25, as written, allows a bondsman with a current bond on an individual, *or one who has ever had a business relationship with the individual in the past,* to contact that person during the initial 24 hours after arrest to solicit new bond business from him. Pruett argues that the Board has shown no valid reason for a rule that squelches competition by prohibiting newcomers to the bail business from competing for that business during the initial 24 hours after arrest.

We agree. In *Greater New Orleans Broadcasting,* the Supreme Court considered the constitutionality of a statute that allowed Indian-owned casinos to participate in broadcast advertising, but prohibited non-Indian casinos from doing the same. 527 U.S. at 190, 119 S.Ct. at 1933. The Court noted that the purpose the government sought to advance—reducing the societal costs of casino gambling—was not advanced by distinguishing between the types of casino owners who could advertise by broadcast. *Id.* at 193, 119 S.Ct. at 1935. "[T]he Government presents no convincing reason for pegging its speech

ban to the identity of the owners or operators of the advertised casinos." *Id.* at 191, 119 S.Ct. at 1934. The Court noted that, while there may be valid reasons for regulating non-Indian businesses differently from tribal businesses, those differences did not "justify abridging non-Indians' freedom of speech more severely than the freedom of their tribal competitors." *Id.* at 193, 119 S.Ct. at 1934. The Court noted that "decisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment." *Id.* at 194, 119 S.Ct. at 1935.

In this case, the Board presented no valid reason to justify a rule that differentiates within the same class of speakers, i.e., bondsmen. The rule, effectively, grants a bondsman with "prior or existing business relationships" an exclusive right to solicit repeat business from its prior customer during the first 24 hours after arrest. The rule also allows a bondsman with prior or existing business relationships with a person requiring a bond an unfettered right to call that person as many times as he wants during the initial 24 hours after arrest, while denying bondsmen without prior or existing business relationships the right to attempt to solicit business at all during the same time period. The exception in Rule 25, as opposed to that in Rule 24, is too broad to sufficiently advance the Board's stated purpose.

Accordingly, we conclude that the portion of Rule 25 that prohibits bondsmen who have no "prior or existing business relationships" with individuals requiring a bond from soliciting bond sales during the initial 24 hours after arrest is an unconstitutional prior restraint on free speech. As such, we overrule the Board's issue relating to the 24–hour prohibition on solicitation of bond business after arrest.

## CONCLUSION

We affirm the portion of the judgment of the trial court that enjoins the Board from enforcing the prohibition against the solicitation of bail bond business during the initial 24–hour period after arrest, found in Rule 25. We reverse the portion of the judgment of the trial court that enjoins the Board from (1) enforcing Rule 24's prohibition against the solicitation of bail bond business from those with unexecuted warrants, (2) enforcing Rule 25's prohibition against the solicitation of bail bond business during non-business hours, and (3) giving effect to the order suspending Pruett's bail bond license. We remand for further proceedings. We express no opinion as to whether Pruett's license should be suspended after consideration of this opinion.

We overrule all pending motions.