**Carl R. PRUETT and National American Insurance Company, Petitioners,**

v.

**HARRIS COUNTY BAIL BOND BOARD et al., Respondents.**

No. 05–0283.

Supreme Court of Texas.

Argued Dec. 6, 2006.

Decided March 28, 2008.

---

David A. Furlow, Kevin J. Parks, Thompson & Knight, L.L.P., Stacy Kelly, MacIntyre & McCullouch LLP, Robert L. Pittsford, Kevin Pennell, Thompson & Knight, LLP, Houston, TX, for Petitioners.

Douglas M. Becker, Toni Hunter, Gray & Becker, P.C., Austin, TX, for Intervenors.

Bruce S. Powers, George Nachtigall, Michael A. Stafford, Harris County Attorneys, Sandra D. Hachem, Harris County Sr. Assistant Attorney, Houston, TX, for Respondents.

Paul K. Nesbitt, Kelly Sutter & Kendrick, Houston, TX, for Amicus Curiae.

Justice O'NEILL delivered the opinion of the Court.

In this case, we consider the extent of the Harris County Bail Bond Board's rule-making authority and the constitutionality of Board rules that restrict solicitation of bail bond customers. At issue are several restrictions prohibiting the solicitation of bail bond business (1) from an individual with an outstanding arrest warrant (the "open-warrant rule"), (2) within twenty-four hours after the execution of an arrest warrant (the "twenty-four-hour rule"), or (3) between the hours of 9:00 p.m. and 9:00 a.m. Monday through Saturday, and before noon or after 9:00 p.m. on Sunday (the "non-business-hours rule"). We hold that the legislative grant of authority in the Bail Bond Act is sufficiently broad to permit the Board's promulgation of the contested solicitation rules. We further hold that the non-business-hours rule withstands constitutional scrutiny, but the open-warrant and twenty-four-hour rules violate the plaintiffs' First Amendment rights. Accordingly, we affirm in part, and reverse in part, the court of appeals' judgment.

## I. Background

Bail bondsmen solicit business in Harris County in a number of ways. A particularly useful tool for identifying potential customers is the Harris County Justice Information Management System Subscriber Access Program (JIMS), an online service bondsmen use to access public-record information about open warrants and incarcerations, including the names, addresses, and phone numbers of individuals with outstanding warrants. Bondsmen use JIMS information to call bondable citizens, informing them that a warrant has been issued for their arrest or that a relative has been jailed but is eligible for bond. Access to the JIMS system is widely available. JIMS information is obtainable on a for-pay basis to anyone who subscribes with the Harris County Clerk's Office. Sheriff's Department employees also disclose JIMS information to attorneys and members of the public who call in to inquire about pending warrants. Harris County has a policy of waiting forty-eight hours after an arrest warrant's issuance to post the warrant information on JIMS, which allows law enforcement officers the opportunity to execute warrants before JIMS information becomes available to the public.

In the late 1990s, members of the Harris County Bail Bond Board [1] began receiving complaints from law-enforcement agencies, peace officers, citizens, and bail bondsmen concerning certain bail bond solicitation practices. Specifically, there was concern that bondsmen were calling the targets of unexecuted warrants, effectively tipping them off to an officer's arrival and increasing the risks of flight, destruction of evidence, and harm to crime victims and arresting officers. There were also citizen complaints about telephone solicitation from bondsmen during non-business hours, particularly of repetitive phone calls during the first twenty-four hours following a family member's arrest. Finally, some bail bondsmen complained that such solicitation practices undermined the effectiveness of traditional advertising, threatened their businesses, and decreased profitability.

In response to these complaints, the Board passed Local Rules 24 and 25 gov-

---

1. The Texas Legislature authorized creation of the Harris County Bail Bond Board when it enacted the Bail Bond Act, now codified as Chapter 1704 of the Texas Occupations Code. *See* TEX. OCC.CODE § 1704.051. The Board is responsible for all aspects of licensing bondsmen in Harris County. *See id.* § 1704.101(3)-(7).

erning solicitation of bail bond business in Harris County, effective March 5, 2001. Local Rule 24, known as the "open-warrant rule," prohibits unsolicited contact of an individual with an outstanding warrant.[2] Local Rule 25 places time restrictions on solicitation of bond business after an arrest has been made, prohibiting any solicitation within the first twenty-four hours after an arrest and, after twenty-four hours has lapsed, prohibiting solicitation between the hours of 9:00 p.m. and 9:00 a.m. Monday through Saturday, and before noon or after 9:00 p.m. on Sunday.[3] Rule 24 contains an exemption for bondsmen who have an "existing business relationship" with an individual requiring a bond, and Rule 25 exempts bondsmen who have "a prior or existing business relationship" with such an individual.

Soon after the Local Rules were promulgated, agents of a competing bonding company filed complaints with the Board alleging that Carl R. Pruett was openly violating the rules. The first complaint alleged violations of Rule 25 based on telephone solicitation of bail bond business during non-business hours and within twenty-four hours after an arrest. The second alleged a violation of both Rules 24 and 25 based on a telephone solicitation during non-business hours of an individual with an outstanding arrest warrant, in response to which the individual fled the area. At the Board hearing on these complaints, Pruett acknowledged that his company violated Rules 24 and 25, but he contended the rules were *ultra vires* and unconstitutional. The Board rejected Pruett's challenge and suspended his license for seven days on each complaint.

Pruett and National American Insurance Company (collectively, "Pruett"), the insurance and surety company for which Pruett acts as an agent, filed this suit against the Board for declaratory and injunctive relief.[4] Pruett challenged the Board's power to promulgate Rules 24 and 25, and further claimed the rules' restrictions on commercial speech violate the First Amendment. The parties filed

---

2. Local Rule 24 provides, in pertinent part:

No bondsman, agent, or employee of a bonding company, may make, cause to be made, or benefit from unsolicited contact, whether by verbal (including both in-person and by telephone), electronic, written or other means, made to solicit any bond business relating to a specific individual with an outstanding warrant that has not been executed. This rule does not apply to the solicitation of bail bond business arising from a warrant issued by a municipality and/or a Justice of the Peace. This rule does not apply to the solicitation of bail bond business if there is an existing business relationship between the bondsman and the individual requiring a bond.

3. Local Rule 25 provides, in pertinent part:

No bondsman, agent, or employee of a bonding company, may make, cause to be made, or benefit from unsolicited verbal contact, including both in-person and by telephone, to solicit any bond business within 24 hours after execution of an arrest warrant. Once the 24 hour period has lapsed, no bondsman, agent, or employee of a bonding company, may make, cause to be made, or benefit from unsolicited contact, whether by verbal (including both in-person and by telephone), electronic, written or other means, to solicit any bond business that is made after 9:00 p.m. or before 9:00 a.m., Monday through Saturday, and after 9:00 p.m. or before 12:00 noon on Sunday. This rule does not apply to the solicitation of bail bond business if there is a prior or existing business relationship between the bondsman and the individual requiring a bond.

4. International Fidelity Insurance Company and Allegheny Casualty Company intervened in the trial court proceedings, supporting the Local Rules and the Board's actions against Pruett. Felix Michael Kubosh, who sat on the Harris County Bail Bond Board in 2004, submitted an *amicus curiae* brief in this Court supporting the rules.

cross-motions for summary judgment. The trial court granted Pruett's motion and permanently enjoined enforcement of the rules. The court of appeals affirmed in part, and reversed in part, the trial court's judgment. 177 S.W.3d 260, 268. The court determined that the Board acted within its rule-making authority in promulgating the solicitation rules. *Id.* The court further upheld the constitutionality of Rule 24's ban on open-warrant solicitation and Rule 25's prohibition of solicitation during non-business-hours, but concluded that the portion of Rule 25 prohibiting bondsmen with no prior or existing business relationship from soliciting individuals within twenty-four hours of an arrest is an unconstitutional restraint on free speech. *Id.* at 275–77. We granted the parties' petitions for review to consider the parameters of the Board's rule-making authority and the constitutional issues raised.

## II. The Bail Bond Board's Rule–Making Authority

Pruett claims the Board's adoption of Rules 24 and 25 exceeded the powers the Bail Bond Act at the time expressly enumerated and was thus *ultra vires.* Specifically, Pruett contends the Legislature did not grant the Board authority to regulate solicitation practices until the Legislature's 2001 amendments to the Occupations Code, which did not take effect until over six months after the Local Rules were passed. We conclude, however, that the Occupations Code as it existed when the Local Rules were promulgated authorized the Board to regulate the solicitation of bail bond business, and the Board did not act *ultra vires* in passing the rules.

■■■■ An agency may adopt only such rules as are authorized by and consistent with its statutory authority. *R.R. Comm'n of Tex. v. Lone Star Gas Co.,* 844 S.W.2d 679, 685 (Tex.1992). Such authority may

be either expressly conferred by statute or implied from other powers and duties given or imposed by statute. *Id.* In deciding whether a particular administrative agency has exceeded its rule-making powers, the determinative factor is whether the rule's provisions are "in harmony with the general objectives of the Act involved." *Gerst v. Oak Cliff Sav. & Loan Ass'n,* 432 S.W.2d 702, 706 (Tex.1968); *see Citizens Bank of Bryan v. First State Bank, Hearne, Tex.,* 580 S.W.2d 344, 348 (Tex.1979). Thus, we turn to the provisions of the Bail Bond Act in deciding the scope of the Board's rule-making authority. *See* Tex. Occ.Code §§ 1704.101–.109. Section 1704.101 of the Occupations Code, both now and when Rules 24 and 25 were promulgated, defines the Board's administrative authority, in pertinent part, as follows:

> A board shall:
>
> (1) exercise powers incidental or necessary to the administration of this chapter;
>
> * * *
>
> (3) supervise and *regulate each phase of the bonding business* in the county;
>
> (4) adopt and post rules necessary to implement this chapter[.]

*Id.* § 1704.101(1), (3), (4) (emphasis added). The Occupations Code requires all applicants for a bail bonding license to file a declaration that the applicant will comply "with this chapter and the rules adopted by the board," *id.* § 1704.154(b)(4)(B) (emphasis added), and grants the Board discretionary power to "revoke or suspend a license if the license holder ... violates this chapter or a rule adopted by the board under this chapter," *id.* § 1704.252(1) (emphasis added). Multiple sections of the Code incorporate board-promulgated rules as grounds for denying, revoking, or refusing to renew a license. *See, e.g., id.* §§ 1704.162, 1704.252(1). Thus, it would

appear that the Legislature explicitly conferred broad regulatory powers on the Board.

Pruett does not necessarily contend otherwise, but claims the Board's powers cannot extend to the imposition of new, license-suspending burdens on bondsmen that the Legislature did not expressly authorize. Because the only prohibition on solicitation contained in the Code when Rules 24 and 25 were passed concerned solicitation of business inside jails, prisons, and police stations, Pruett contends the Board had no power to otherwise restrict bail bond solicitation. *See id.* §§ 1704.252(10), 1704.304(c). The fact that the Legislature subsequently amended the Occupations Code to broaden the prohibition on solicitation, Pruett contends, confirms that the Board's authority had theretofore been restricted. Pruett also claims a 1999 amendment to the definition of the term "bonding business" narrowed the Board's power and foreclosed its regulation of bail bond solicitation. We disagree.

First, section 1704.101(3) grants the Board broad authority to "supervise and regulate each phase of the bonding business," whether or not, as Pruett posits, the authority conferred by subsections (1) and (4) is limited to existing statutory provisions within "this chapter." *Id.* § 1704.104. When a statute expressly authorizes an agency to regulate an industry, it implies the authority to promulgate rules and regulations necessary to accomplish that purpose. *See Dallas County Bail Bond Bd. v. Stein,* 771 S.W.2d 577, 580 (Tex.App.-Dallas 1989, writ denied). In *Stein,* the court rejected the argument that the local bail bond board had exceeded its authority by enacting a local rule prohibiting licensed bondsmen from employing persons with a prior felony conviction, even though the Bail Bond Act does not regulate employees of bondsmen. *Id.*

at 580–81. "By conferring upon an agency the power to make rules and regulations necessary to carry out the purposes of an act," the court reasoned, "the Legislature forecloses the argument that it intended to spell out the details of regulating an industry." *Id.* at 580 (citing *Tex. Liquor Control Bd. v. Super Sav. Stamp Co.,* 303 S.W.2d 536, 540 (Tex.Civ.App.-San Antonio 1957, writ ref'd n.r.e.) (cited with approval in *Gerst,* 432 S.W.2d at 706)); *see also Black v. Dallas County Bail Bond Bd.,* 882 S.W.2d 434, 436 (Tex.App.-Dallas 1994, no writ) (holding that the "broad grant of authority to supervise and regulate all phases of the bonding business impliedly authorizes the Board to enact rules on any phase of the business").

The authorities Pruett relies upon for a restricted interpretation of the Board's powers are distinguishable in that they were either based upon a narrower grant of authority in a predecessor statute, *Bexar County Bail Bond Bd. v. Deckard,* 604 S.W.2d 214, 217 (Tex.Civ.App.-San Antonio 1980, no writ), involved powers explicitly limited by statute, *Camacho v. Samaniego,* 831 S.W.2d 804, 812 (Tex.1992), or interfered with detailed licensing regimes established by the Legislature, *Austin v. Harris County Bail Bond Bd.,* 756 S.W.2d 65, 67 (Tex.App.-Houston [1st Dist.] 1988, writ denied). Here, the scope of the Board's explicit power is unambiguously broad, and Pruett can point to no part of the Occupations Code that would appear to single out solicitation as an impermissible area of agency rule-making. *Cf. Camacho,* 831 S.W.2d at 811–12 (noting that the board was not authorized to collect a preconviction bail bond approval fee because the Texas Code of Criminal Procedure expressly prohibited "imposition of costs" by officers). Bail bond solicitation practices fall squarely within a "phase of the bonding business," which the Legislature ex-

pressly authorized the Board to regulate. *See* TEX. OCC.CODE § 1704.101(3). It is true, as Pruett asserts, that courts have held bail bond boards may not add to licensing requirements in light of the extremely detailed licensing regime that the Legislature established. *Cf. Walstad v. Dallas County Bail Bond Bd.*, 996 S.W.2d 314, 316 (Tex.App.-Dallas 1999, no pet.); *Castaneda v. Gonzalez*, 985 S.W.2d 500, 503 (Tex.App.-Corpus Christi 1998, no pet.); *Tex. Fire & Cas. Co. v. Harris County Bail Bond Bd.*, 684 S.W.2d 177, 178–79 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Deckard*, 604 S.W.2d at 216; *see also* Op. Tex. Att'y Gen. No. JM–102 (1989); Op. Tex. Att'y Gen. No. JC–0366 (2001). But a board's attempt to alter or add to licensing requirements specified in the Bail Bond Act is not the same as a board's regulation of bondsmen once they are licensed. The Act grants the Board broad power to "supervise and regulate each phase of the bonding business" and to suspend a license if the holder "violates this chapter or a rule adopted by the board under this chapter." TEX. OCC.CODE § 1704.252(c). Furthermore, the Board may exercise powers "incidental or necessary" to the administration of the bonding business under the Occupations Code. *Id.* § 1704.101(1). Solicitation of potential bail bond customers comprises a "phase of the bonding business," and suspension of a license for failure to comply with the Board's rules concerning solicitation does not add to the requirements for licensure under the Bail Bond Act.

◼ Pruett points to the Legislature's subsequent expansion of the prohibition on solicitation beyond "building[s] in which prisoners are processed or confined" as evidence that the Board's powers were theretofore restricted. However, we agree with the court of appeals that the Legislature's subsequent amendment of the Occupations Code is of little assistance in determining the scope of the Board's authority when Rules 24 and 25 were passed. 177 S.W.3d at 267. We ascertain legislative intent concerning the Board's authority from the plain and common meaning of the statute granting such authority. *See Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866 (Tex.1999); *Argonaut Ins. Co. v. Baker*, 87 S.W.3d 526, 529 (Tex.2002). That another session of the Legislature decided to incorporate into the Bail Bond Act broader statewide restrictions on bail bond solicitation does not mean that the Board lacked the power to regulate solicitation under the Legislature's prior broad grant. *See Rowan Oil Co. v. Tex. Employment Comm'n*, 152 Tex. 607, 263 S.W.2d 140, 144 (1953) (stating "one session of the Legislature [does not] have the power to construe the Acts or to declare the intent of a past session"); *cf. Ervin v. State*, 991 S.W.2d 804, 816 (Tex. Crim.App.1999) (stating "we … give little weight to … subsequent enactments in interpreting the prior law"). Our decision in *Cash America International, Inc. v. Bennett*, 35 S.W.3d 12 (Tex.2000), does not indicate otherwise, as Pruett contends. There, as here, we looked to the statutory language in deciding whether the Texas Pawnshop Act provided an exclusive or an alternative remedy for disputes between pledgors and pawnbrokers concerning lost pledged property, noting simply that subsequent amendments to the Act indicated continued legislative unwillingness to supplant common law remedies. *Id.* at 17–18.

Pruett also contends amendments to the Bail Bond Act's definition of "bonding business" demonstrate legislative intent to narrow the Board's regulatory power. Before 1999, the Bail Bond Act defined a "bonding business" as "the occupation in which a bondsman is engaged." Act of May 26, 1981, 67th Leg., R.S., ch. 312, § 2,

1981 Tex. Gen. Laws 875, 876. The Occupations Code was codified in 1999, and the definition of "bonding business" was changed to "the execution of a bail bond by a bail bond surety." Act of May 10, 1999, 76th Leg., R.S., ch. 388, § 1, 1999 Tex. Gen. Laws 1431, 2279. According to Pruett, making a phone call is not the same as signing a piece of paper, and the only "bonding business" the Board was authorized to regulate when the Local Rules were passed concerned phases of the bonding business that involve execution of bonds. We reject Pruett's argument for a number of reasons. First, House Bill 3155, which codified the Bail Bond Act into the Occupations Code, was intended as a recodification only, not as a substantive change in the law. *See* Tex. H.B. 3155, 76th Leg., R.S., 1999 Tex. Gen. Laws 1431. Because the differences in the definitional language are not irreconcilable, we presume the Legislature intended the same meaning. *See City of Austin v. Southwestern Bell Tel. Co.,* 92 S.W.3d 434, 444 (Tex.2002). Moreover, we agree with the court of appeals that solicitation of bail bond customers is a necessary first step in a bail bond's execution, and is thus a "phase of the bonding business," which the Board has the express power to regulate. 177 S.W.3d at 270.

 Finally, Pruett contends the Local Rules violate the Texas Public Information Act (formerly known as the Texas Open Records Act) in that they prevent access to information that is in the public's interest to know, including JIMS information about open warrants and incarcerations. *See* Tex. Gov't Code §§ 552.001–.029. Pruett asserts standing to raise the point as a vendor on behalf of his current and prospective customers and in his own right

as a bondsman. However, as to Pruett's individual challenge, the rules do not prohibit him or other bondsmen from accessing public information, nor does Pruett contend that he has been denied access to that information. Similarly, to the extent Pruett claims standing on the public's behalf, the rules do not deny the public's access to warrant information. As we have noted, JIMS information is available to the public either by subscription or by calling the Sheriff's Department.

We conclude that the Board did not act *ultra vires* or exceed its authority in promulgating Local Rules 24 and 25, and now turn to Pruett's constitutional challenge.

### III. Pruett's First Amendment Challenge

Pruett contends Harris County Local Rules 24 and 25 deny his First Amendment right to commercial speech. In a parallel federal-court proceeding, Pruett brought a similar challenge to the state statute governing bail bond solicitation that the Legislature enacted after the disputed Local Rules were passed. *See Pruett v. Harris County Bail Bond Bd.,* 499 F.3d 403 (5th Cir.2007). That statute, section 1704.109 of the Texas Occupations Code, contains substantially the same prohibitions that appear in the Local Rules. In *Pruett,* the Fifth Circuit held unconstitutional section 1704.109's restrictions on solicitation of individuals with open warrants and within twenty-four hours after an arrest warrant's execution, but upheld the prohibition on solicitation during non-business hours. *Id.* at 412–16. Because the prohibitions before us are virtually identical, we look to the Fifth Circuit's analysis for guidance.[5]

---

**5.** Although Pruett raised several state-constitutional challenges in the courts below, he has failed to adequately brief them in this Court.

*See* Tex.R.App. P. 38.1(h). Furthermore, as noted by the court of appeals, 177 S.W.3d at 271 n. 9, Pruett has not articulated any rea-

■ The parties agree that the speech the Local Rules restrict is commercial in nature and must be constitutionally gauged under the Supreme Court's analysis in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[6] Commercial speech is generally afforded less constitutional protection than other forms of constitutionally guaranteed expression. *Id.* at 563, 100 S.Ct. 2343. The government may ban misleading or deceptive commercial speech, as well as speech that relates to illegal activity. *Id.* at 563–64, 100 S.Ct. 2343. But when, as here, the commercial speech is neither illegal nor misleading, the government's power is more circumscribed. *Id.* at 564, 100 S.Ct. 2343. For the rules to withstand constitutional scrutiny, (1) the Board must assert a substantial interest that the solicitation restrictions are designed to achieve, (2) the restrictions must directly or materially advance that interest, and (3) the restrictions must be "narrowly drawn"—they cannot survive if the interest that the Board asserts could be served as well by a more limited restriction. *See id.* at 564–65, 100 S.Ct. 2343.

Pruett contends that, in applying *Central Hudson,* we may consider only information that was before the Board at the time it passed the rules. In *Pruett,* the Fifth Circuit rejected that contention, stating, "*Central Hudson* does not require that evidence used to satisfy its strictures exist pre-enactment.... [The state] must

at least articulate regulatory objectives to be served. But that doesn't mean the state can proffer only reasons locatable in the legislative record." *Pruett,* 499 F.3d at 410–11. The Supreme Court has held that the proponent of a commercial speech restriction failed to meet its burden under *Central Hudson* when the record was devoid of even anecdotal evidence justifying the restriction. *Edenfield v. Fane,* 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1983). But the Supreme Court has numerous times accepted and analyzed various forms of anecdotal evidence, outside studies, and general literature in evaluating the *Central Hudson* factors. *See Fla. Bar v. Went for It, Inc.,* 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); *Edenfield,* 507 U.S. at 771–73, 113 S.Ct. 1792. In *Florida Bar,* the Supreme Court observed that "even[ ] in a case applying strict scrutiny [it had allowed regulators] to justify restrictions based solely on history, consensus, and 'simple common sense.'" *Fla. Bar,* 515 U.S. at 628, 115 S.Ct. 2371 (quoting *Burson v. Freeman,* 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)). Accordingly, we will consider the entire record in evaluating the constitutionality of the Board's rules. *See Pruett,* 499 F.3d at 410–11.

## A. Rule 24's Open–Warrant Restriction

Rule 24 prohibits unsolicited contact of individuals with outstanding arrest warrants unless the bondsman has an "existing business relationship" with the individ-

---

son why the Texas constitution would be more protective of free-speech rights than the federal constitution. Consequently, we assume that the protections are identical. *See Tex. Dep't of Transp. v. Barber,* 111 S.W.3d 86, 106 (Tex.2003).

**6.** The Supreme Court noted, in *Thompson v. Western States Medical Center,* 535 U.S. 357, 367–68, 122 S.Ct. 1497, 152 L.Ed.2d 563

(2002), that "several Members of the Court have expressed doubts about the *Central Hudson* analysis," although the Court declined to "break new ground" in that case. Despite the urging of *amicus curiae,* we are not at liberty to modify or abandon the *Central Hudson* analysis unless and until the Supreme Court acts to do so.

ual requiring the bond. The Rule does not apply to solicitation of bond business arising from warrants issued by a municipality or a Justice of the Peace, warrants the Board terms "low-level misdemeanor warrants." Section 1704.109(b)(1) of the Occupations Code, which the Fifth Circuit declared unconstitutional in *Pruett,* contains virtually the same prohibition and exemptions.[7] *Id.* at 414.

According to the Board, the interests Rule 24 is designed to protect are: (1) reduction of flight risk for felony and high-level misdemeanor offenders; (2) protection of officers, victims, and the public from harm during an arrest; (3) prevention of retribution against victims or witnesses; and (4) preservation of evidence that might otherwise be destroyed if a suspect is tipped off to an impending arrest. In *Pruett,* the Board asserted the same interests as justification for section 1704.109(b)(1). *Id.* at 411. We agree with the Board, and the Fifth Circuit's conclusion in *Pruett,* that these asserted interests are substantial. *See United States v. Salerno,* 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("The government's interest in preventing crime by arrestees is both legitimate and compelling."). In *Pruett,* the Fifth Circuit concluded that section 1704.109(b)(1)'s virtually identical open-warrant restriction was not sufficiently narrowly tailored to meet First Amendment demands. *Pruett,* 499 F.3d at 412–13. We believe Rule 24 suffers the same infirmity.

*Central Hudson* does not require the government to employ the least-restrictive means to accomplish its purpose, but does require "a good fit between the means and the goals." *Id.* at 412 (citing *Speaks v. Kruse,* 445 F.3d 396, 400 (5th Cir.2006)). In *Pruett,* the Fifth Circuit noted that section 1704.109(b)(1)'s open-warrant prohibition has no temporal limitation, making it inherently constitutionally suspect. *Id.* at 414. At the same time, the evidence in Pruett indicated that extending the JIMS forty-eight-hour posting delay to seventy-two or ninety-six hours after an arrest warrant is issued would greatly alleviate Harris County's stated concerns. *Id.* at 413. The court in Pruett further emphasized that Harris County itself, through the Sheriff's Department and other county law-enforcement agencies, notifies thousands of individuals each year of outstanding warrants against them, and concluded that "Harris County cannot give such notice itself and then claim that restricting notice by others is necessary to the safety of its officers and the public and the prevention of flight." *Id.* The court acknowledged that the Sheriff's Department only notified individuals who were charged with "non-serious" misdemeanors, some of whom would come within the statute's exclusion for Class C misdemeanors, but concluded the statutory prohibition could be more narrowly drawn to allow solicitation of certain Class A and Class B misdemeanor targets who posed no assaultive threat and were not likely to run, such as hot-check writers, drivers on suspended licens-

---

**7.** Section 1704.109 provides, in pertinent part:

(b) A bail bond surety, an agent of a corporate surety or an employee of the surety or agent may not make, cause to be made, or benefit from unsolicited contact:

(1) through any means, including in person, by telephone, by electronic methods, or in writing, to solicit bonding business related to an individual with an outstanding arrest warrant that has not been executed, unless the bail bond surety or agent for a corporate surety has an existing bail bond on the individual[.]

\* \* \*

(c) This section does not apply to a solicitation or unsolicited contact related to a Class C misdemeanor.

Tex. Occ.Code § 1704.109(b)(1), (c).

es, and certain DWI offenders. *Id.* Section 1704.109(b)(1)'s temporal and prohibitive breadth, the court concluded, did not meet the First Amendment's narrow-tailoring demand and thus violated Pruett's commercial-speech rights. *Id.* at 413–14.

 The Board does not attempt to distinguish the *Pruett* analysis based on any substantive distinction between the Local Rules and the provisions of the Occupations Code analyzed in that case. Rather, the Board contends that it lacks the power to institute the more narrowly drawn regulations that the Fifth Circuit suggested. According to the Board, it is the District Clerk who is in charge of implementing the JIMS blackout period, and the Sheriff's Department that is in charge of screening targets for notification of certain Class C and Class B misdemeanor warrants. But whether or not the Board itself can implement an extended JIMS blackout or control the Sheriff's screening process, we conclude that Rule 24 is nevertheless constitutionally deficient because it fails, in its present form, to advance the Board's interest in safety in a material way. The government bears the burden not only to demonstrate that the harms it seeks to avoid are real, but that its restriction "will in fact alleviate them to a material degree." *Edenfield,* 507 U.S. at 770–71, 113 S.Ct. 1792. This requirement is critical, else "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Id.* at 771, 113 S.Ct. 1792. The Supreme Court has declined to uphold regulations that "only indirectly advance the state interest involved." *Central Hudson,* 447 U.S. at 564, 100 S.Ct. 2343. In *City of Cincinnati v. Discovery Network, Inc.,* for example, the Supreme Court held that a city's ban on newsracks containing "commercial handbills," which did not apply to news racks containing "newspapers," lacked a "reasonable fit" between the city's asserted interest in safety and esthetics and the means chosen to serve that interest. 507 U.S. 410, 417–18, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The Court concluded the city had shown "insufficient justification for the discrimination against the respondents' use of newsracks that are no more harmful than the permitted newsracks" and "no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks." *Id.* at 418, 425, 113 S.Ct. 1505. Likewise, in *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), the Supreme Court concluded that a federal regulation prohibiting beer labels from displaying alcohol content could not materially advance the government's interest in avoiding "strength wars" among brewers because of the "overall irrationality" of the regulatory scheme. *Id.* at 491, 115 S.Ct. 1585. That scheme prohibited some methods of advertising beer strength and not others, while mandating exactly the same form of strength-advertising for wine and spirits. *Id.* at 488, 115 S.Ct. 1585. The Court acknowledged that the government's goal was valid, but concluded that "the irrationality of [its] unique and puzzling regulatory framework ensure[d] [that] ... the ban w[ould] fail to achieve that end." *Id.* at 489, 115 S.Ct. 1585.

 Local Rule 24 is similarly problematic. A rule prohibiting bondsmen from contacting individuals with outstanding warrants when JIMS makes warrant information so freely accessible by others, including the public, county employees, lawyers, arrestees themselves, and even bondsmen as to existing customers, is not a measure that materially advances officer or public safety or forestalls targets' flight. Nothing in the record suggests that the dissemination of open-warrant information

is more likely to inspire violence or flight when channeled through bail bondsmen than when it is disseminated through the myriad other potential sources. *Cf. Discovery Network,* 507 U.S. at 418, 113 S.Ct. 1505; *Greater New Orleans Broad. Ass'n, Inc. v. United States,* 527 U.S. 173, 191, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) ("[T]he Government presents no convincing reason for pegging its speech ban to the identity of [the speakers]."). Singling out bail bondsmen under these circumstances fails to materially advance the interests the Board asserts and cannot survive constitutional scrutiny.

## B. Rule 25's Twenty–Four–Hour Ban

Local Rule 25 prohibits verbal solicitation of potential bail bond customers during the first twenty-four hours after an arrest in the absence of "a prior or existing business relationship between the bondsman and the individual requiring a bond." As with Rule 24's open-warrant restriction, there is no allegation here that the information Pruett seeks to provide is illegal, deceptive, or misleading; accordingly, the Rule's constitutionality is gauged by the *Central Hudson* factors. And as with Rule 24, the Fifth Circuit applied those factors in *Pruett* to an almost identical provision of section 1704.109 of the Occupations Code and concluded that it violated constitutional commercial-speech protections. *Pruett,* 499 F.3d at 414–15. We agree with the Fifth Circuit's analysis.

▮ Rule 25 is purportedly designed to protect the general citizenry from repetitive and harassing phone solicitations by bail bondsmen, which the Board claims are most intense during the initial twenty-four hours after an arrest. Certainly protecting the tranquility and privacy of the home is a governmental interest "of the highest order in a free and civilized society," and we presume the Board had a substantial

interest in protecting Harris County residents from undue harassment. *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). The Board has not shown, however, that the twenty-four-hour ban materially advances that interest. *See Pruett,* 499 F.3d at 414–15. The Board points to evidence that citizen complaints about harassing solicitation dropped drastically ("80 to 90 percent") after Rule 25 became effective. But the Board has not demonstrated that the reduction is attributable to the twenty-four-hour ban rather than the non-business-hours restriction. As in *Pruett,* the record here shows that the bulk of complaints about calls received within the restricted twenty-four-hour period were received during non-business hours. Thus, it is just as likely that the reduction resulted from the nonbusiness-hours ban as from the twenty-four-hour restriction. Moreover, we believe that the Fifth Circuit properly "g[a]ve credence to the common-sense argument that most families would like to know when their members are in jail." *Id.* at 415. The Supreme Court has indicated that the particular interests of the targets of uninvited solicitation may be taken into consideration in evaluating the constitutionality of a commercial-speech restriction. *See Fla. Bar,* 515 U.S. at 625–29, 115 S.Ct. 2371. In *Florida Bar,* the Supreme Court concluded that a thirty-day limit on lawyer solicitation was permissible, considering the particular sensitivity of victims' families in the aftermath of an accident. *Id.* In this case, the solicited individuals are incarcerated, with their freedom curtailed and personal safety potentially at risk. Common sense suggests that the interests of arrestees and their families favor notification sooner rather than later. Finally, as noted in *Pruett,* the record is devoid of evidence that the twenty-four-hour ban will not simply postpone the commencement of harassing behavior until the twen-

ty-fifth hour. *Pruett,* 499 F.3d at 415. For the same reasons section 1704.109's twenty-four-hour ban failed to comport with *Central Hudson,* Rule 25 unconstitutionally restricts commercial speech.

## C. Rule 25's Non–Business–Hours Ban

■ Local Rule 25 provides that, once twenty-four hours have elapsed from an arrest warrant's execution, solicitation by bail bondsmen is prohibited between the hours of 9:00 p.m. and 9:00 a.m. Monday through Saturday, and before noon or after 9:00 p.m. on Sunday. Even before the Board enacted Rules 24 and 25, much telephonic solicitation was illegal during these same hours. *See* TEX. BUS. & COM.CODE § 37.02(a); 47 C.F.R. 64.1200(e)(1) (2000). The Fifth Circuit in *Pruett,* analyzing an Occupations Code provision that banned solicitations during the same periods, remarked that it had "found no successful challenges to general nighttime solicitation bans" under *Central Hudson. Pruett,* 499 F.3d at 416. Unlike the statute the Fifth Circuit analyzed in *Pruett,* however, Rule 25 contains an exception allowing solicitation by bondsmen with "a prior or existing business relationship" with the individual requiring a bond. Pruett contends this exception impermissibly and irrationally discriminates among bail bondsmen such that the Rule fails to materially advance the government's stated purpose. Based on the record before us, we disagree.

The record indicates that the Board included the exception in an effort to balance the privacy interests of arrestees and their families against the interests of bail bondsmen in maintaining their professional relationships. One Board member testified that the complaints the Board had received suggested that members of the public particularly objected to calls from bondsmen who were unknown to them. He testified that "we were trying to stop ... the complaints from people that said, 'I have heard from someone, I have no idea who they are, they keep calling, I don't know why, I don't know who they are [or] where they're coming from.'" The Board reasoned that those with a prior business relationship would not be such "complete stranger[s]."

We agree with the Board's common-sense suggestion that a telephone call from a bondsman with a prior or existing relationship may be received more favorably than calls from strangers; thus, a restriction that exempts bondsmen with prior or existing relationships is consistent with the Board's goal of decreasing harassment. We note that solicitation limits with a similar exception have been adopted by the Federal Communications Commission and upheld by the Eighth Circuit. *See Missouri v. Am. Blast Fax, Inc.,* 323 F.3d 649, 657 (8th Cir.2003) (rejecting plaintiffs' contention that the established-business exception rendered regulations "unconstitutionally inconsistent," based in large part on the record presented by the FCC during rulemaking); In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 F.C.C.R. 8752, 8769–71 (1992) (interpreting the federal Telephone Consumer Protection Act not to prohibit the sending of unsolicited faxes to a recipient with whom the sender has a prior or existing business relationship). We conclude that Rule 25's "prior or existing business" exemption does not prevent the non-business-hours ban from materially advancing the interests the Rule was intended to protect.

## IV. Conclusion

We conclude that the Board did not act *ultra vires* in promulgating Local Rules 24 and 25. Nevertheless, Rule 24 and the twenty-four-hour ban contained in Rule 25 fail the *Central Hudson* test and violate

Pruett's First Amendment commercial-speech rights. We also hold that Rule 25's nonbusiness-hours prohibition comports with *Central Hudson* and is a valid regulation under the First Amendment. Accordingly, we affirm in part, and reverse in part, the court of appeals' judgment.