**Affirmed and Opinion filed February 1, 2024.**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00600-CV

**SUNYA CLAIBORNE, D/B/A ALL ABOUT BAIL BONDS, AGENT FOR ALLEGHENY CASUALTY CO., Appellant**

**V.**

**HARRIS COUNTY BAIL BOND BOARD, Appellee**

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2022-24216**

## OPINION

Appellant Sunya Claiborne, doing business as All About Bail Bonds, agent for Allegheny Casualty Company ("Claiborne"), appeals the trial court's denial of her motion for a temporary injunction against Harris County Bail Bond Board ("the Board"). Claiborne contends that two local rules adopted by the Board, under which payment of a ten percent premium is a prerequisite for issuance of a bail bond for seventeen enumerated crimes— "the 10% Rule"— violate anti-trust laws,

constitute ultra vires acts, and violate the separation of powers doctrine. We affirm.

## I. BACKGROUND

One of the ways a criminal defendant may post bail is through a bail bond obtained from a bail bondsman. *See* Tex. Code Crim. Proc. Ann. arts. 17.01–17.02. A bail bondsman typically charges ten percent of the face amount of bail as a criminal defendant's premium, which is the industry standard. A bail bondsman then acts as a surety, posting a written bond to ensure the criminal defendant's appearance in court proceedings.[1] *See id.* art. 17.02. Claiborne is a bail bondsman in Harris County, Texas. Although she typically charges a ten percent premium to issue a bond, she almost always offers unsecured payment plans to her clients because few purportedly have the funds, property, or collateral to pay the ten percent premium upfront.

The evidence shows that such payment plans are widely used in Harris County's bail bonds industry. A spot check from the Harris County Sheriff's Office shared with the Board before its vote on the 10% Rule showed numerous such payment plans in use by various bail bondsmen. In one example, a defendant's bail had been set at $1,200,000, but his bondsman posted bond after allowing the defendant to make a down payment of $34,000 (or 2.83%) towards the 10% premium of $120,000. In another example, a defendant's bail had been set at $830,000, but his bondsman charged a premium of $50,095 (6.04%) and allowed a downpayment of $18,500 (or 2.23%) before posting bond.

In April 2023, the Board adopted the 10% Rule in local rules 19 and 20, requiring payment of ten percent of the total bond amount before the bond can be

---

[1] Chapter 17 of the Code of Criminal Procedure uses "bail" and "bond" interchangeably. *Ex parte Reyes-Martinez*, 653 S.W.3d 273, 279 n.2 (Tex. App.—Austin 2022, no pet.).

posted for seventeen named "serious violent or sexual offenses":[2]

19. Before posting a surety bond for release of a pretrial detainee charged in state or county court in Harris County with a serious violent or sexual offense, persons or entities licensed as a bail bond surety in Harris County must collect a premium of at least 10 percent of the total surety bond amount and present proof of payment of the 10 percent premium to the Harris County Sheriff in the form of a sworn affidavit setting out the premium amount paid, identifying how the premium was paid (including, but not limited to, by cash, type of cash equivalent, property transfer, or property lien), and identifying who paid the premium.

For the purpose of this rule, a "serious violent or sexual offense" is one defined in the following sections of the Texas Penal Code:
1. Section 19.02 (murder);
2. Section 19.03 (capital murder);
3. Section 20.04 (aggravated kidnapping);
4. Section 20A.02 (trafficking of persons);
5. Section 20A.03 (continuous trafficking of persons);
6. Section 21.2 (continuous sexual abuse of young child or disabled individual);
7. Section 21.11 (indecency with a child);
8. Section 22.011 (sexual assault);
9. Section 22.021 (aggravated sexual assault);
10. Section 25.072 (repeated violation of certain court orders or conditions of bond in family violence, child abuse or neglect, sexual assault or abuse, indecent assault, stalking, or trafficking case);
11. Section 25.11 (continuous violence against the family);
12. Section 29.03 (aggravated robbery);
13. Section 43.25 (sexual act with a child)
14. Attempted murder;
15. Section 22.02 (aggravated assault);
16. Burglary of a habitation with intent to commit a serious

[2] The seventeen offenses are largely the same "offense[s] involving violence" for which a criminal defendant is disallowed a personal bond. *See* Tex. Code Crim. Proc. Ann. art. 17.03(b-2)–(b-3). A personal bond does not require a payment, a surety, or other security. *Id*. art. 17.03(a).

violent or sexual offense;
17. Engaging in organized crime involving a serious violent or sexual offense.

20. Persons or entities licensed as a bail bond surety in Harris County who have posted a surety bond securing the pretrial release of any pretrial detainee in Harris County charged in Harris County with any county or state court criminal case must report to the Harris County Sheriff the criminal case number for which the surety bond is securing pretrial release, and the premium amount collected by the bail bond surety before the surety bond was posted.

HARRIS CNTY. BAIL BOND BD., Tex., Local Rules, Rule 19–20 (Apr. 13, 2022).

The evidence shows that after the 10% Rule took effect, Claiborne lost business, experienced an approximate one-third decline in revenue, and incurred a noticeable drop in the number of felony bonds she wrote for the seventeen crimes covered by the 10% Rule. Claiborne sued the Board to enjoin enforcement of the 10% Rule, and the parties submitted the issue to the trial court on stipulated facts in a temporary injunction hearing. The trial court denied the temporary injunction, and this interlocutory appeal followed.[3]

## II. ISSUES

In one issue that we construe as three, Claiborne argues that the 10% Rule (1) is a per se antitrust violation for which the Board is not entitled to state-action immunity; (2) is an ultra vires act by the Board; and (3) violates the separation of powers doctrine.

### A. STANDARD OF REVIEW

The purpose of a temporary injunction is to preserve the status quo of the

---

[3] Interlocutory judgments are not appealable unless explicitly allowed by statute. *Stary v. DeBord*, 967 S.W.2d 352, 352–53 (Tex. 1998) (per curiam). Section 51.014(a)(4) permits an appeal from an interlocutory order of a district court that grants or refuses a temporary injunction. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4).

4

litigation's subject matter pending trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Temporary injunctions are an extraordinary remedy and do not issue as a matter of right. *Id.* (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) (per curiam)). To obtain a temporary injunction, an applicant need not establish that it will prevail upon a final trial on the merits, but it must plead and prove that it (1) has a cause of action against the opposing party; (2) has a probable right on final trial to the relief sought; and (3) faces probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204; *Hoist Liftruck Mfg. v. Carruth–Doggett, Inc.*, 485 S.W.3d 120, 122 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

We review a trial court's decision to grant or deny a temporary injunction for an abuse of discretion. *Butnaru*, 84 S.W.3d at 204. "A trial court abuses its discretion when it acts with disregard of guiding rules or principles or when it acts in an arbitrary or unreasonable manner." *In re Acad., Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021) (orig. proceeding). We may not substitute our judgment for that of the trial court. *Butnaru*, 84 S.W.3d at 204. We review the evidence submitted to the trial court in the light most favorable to its ruling, drawing all legitimate inferences from the evidence and deferring to the trial court's resolution of any conflicting evidence. *Shor v. Pelican Oil & Gas Mgmt.*, 405 S.W.3d 737, 748 (Tex. App.—Houston [1st Dist.] 2013, no pet.). A trial court's decision "in either granting or refusing the temporary injunction will not be reversed upon appeal unless it is determined that the trial court has been guilty of abuse of discretion or has failed to apply the law correctly to undisputed facts." *Manning v. Wieser*, 474 S.W.2d 448, 449 (Tex. 1971).

## B.    ANTITRUST & STATE-ACTION IMMUNITY

In Claiborne's first issue, she contends that the 10% Rule violates the Texas

Free Enterprise and Antitrust Act ("Texas Antitrust Act") and the Board is not entitled to state-action immunity for its violation of this statute. The Texas Antitrust Act's purpose is to maintain and promote economic competition in trade and to provide the benefits of competition to Texas consumers. *See* Tex. Bus. & Comm. Code Ann. §§ 15.01, 15.04. It states that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful," *id.* § 15.05(a), which constitutes a prohibition against "unreasonable restraints of trade." *AMC Ent. Holdings v. iPic-Gold Class Enter.*, 638 S.W.3d 198, 207 (Tex. 2022).

The state acting in its sovereign capacity, however, is generally immune from antitrust laws. *Parker v. Brown*, 317 U.S. 341, 350–51 (1943); *see N.C. State Bd. of Dental Exam'rs v. F.T.C.*, 574 U.S. 494, 503 (2015). The state "in some spheres may impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *Dental Exam'rs*, 574 U.S. at 503. *Parker* state-action immunity from antitrust laws is not unbounded, however, *id.* at 504–05, and it does not always extend to nonstate actors carrying out a state's regulatory program. *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224–25 (2013). Thus, assuming the 10% Rule violates the Texas Antitrust Act, a closer analysis is required when the activity at issue is not directly that of the state, but rather is carried out by others pursuant to state authorization. *See id.* at 225.

Courts use three approaches in analyzing *Parker* state-action immunity. First, actions by a state legislature or state supreme court (when acting legislatively) are *ipso facto* immune from antitrust laws. *Hoover v. Ronwin*, 466 U.S. 558, 567–68 (1984). Second, *Parker* state-action immunity attaches to local government entities' activities that are undertaken pursuant to "a clearly articulated and affirmatively expressed" state policy to displace competition. *Hallie v. Eau*

6

*Claire*, 471 U.S. 34 46–47 (1985); *see Phoebe Putney Health Sys.*, 568 U.S. at 226. Third, if a nonstate actor is controlled by active market participants, it must meet a two-part test to receive *Parker* state-action immunity: fulfilling the aforementioned "clear articulation" requirement and receiving "active supervision" by the state. *Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980); *see Dental Exam'rs*, 574 U.S. at 503–04; *Phoebe Putney Health Sys.*, 568 U.S. at 225.

Claiborne and the Board agree that the second *Parker* approach applies to the Board's adoption of the 10% Rule but disagree whether under this approach the state has clearly articulated and affirmatively expressed a policy allowing the Board to displace competition. Claiborne details portions of the legislative history of the Bail Bond Act, cites the Code Construction Act, and compares the Bail Bond Act's broader language to more specific regulations applicable to other industries to demonstrate that the legislature did not intend to displace competition. To pass the "clear articulation" test, however, it is unnecessary for the state legislature to explicitly state in the statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects. *Phoebe Putney Health Sys.*, 568 U.S. at 226. Such a requirement would embody an unrealistic view of how legislatures work and how statutes are written. *Id.* at 229. Rather, state-action immunity applies if the anticompetitive effect was the foreseeable result of what the State authorized. *Id.* at 227; *Hallie v. Eau Claire*, 471 U.S. 34, 46–47 (1985). "The clear articulation requirement is satisfied 'where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature.'" *Dental Exam'rs*, 574 U.S. at 506–07 (quoting *Phoebe Putney Health Sys.*, 568 U.S. at 229).

We thus examine the provisions of the Bail Bond Act to determine whether

displacement of competition is the inherent, logical, or ordinary result of the authority delegated to the Board. The Bail Bond Act grants administrative authority to the Board to "supervise and regulate each phase of the bonding business in the county." Tex. Occ. Code Ann. § 1704.101(1). The act also states that the Board shall "exercise powers incidental or necessary to the administration of this chapter" and shall "adopt and post rules necessary to implement this chapter." *Id.* § 1704.101(3), (4). From these provisions, "it would appear that the Legislature explicitly conferred broad regulatory powers on the Board." *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 452–53 (Tex. 2008). When a statute expressly authorizes an agency to regulate an industry, it implies the authority to promulgate rules and regulations necessary to accomplish that purpose. *Id.* at 454. "By conferring upon an agency the power to make rules and regulations necessary to carry out the purposes of an act, the Legislature forecloses the argument that it intended to spell out the details of regulating an industry." *Dallas Cnty. Bail Bond Bd. v. Stein*, 771 S.W.2d 577, 580 (Tex. App.—Dallas 1989, writ denied).

When the legislature grants authority to comprehensively regulate an industry, displacement of competition is the inherent, logical, and ordinary result. *See Spec's Fam. Partners, Ltd. v. Nettles*, 972 F.3d 671, 683 (5th Cir. 2020) (concluding that commission's mandate to regulate the alcoholic beverage industry, including ensuring fair competition, contemplated the commission might engage in anticompetitive conduct); *see also, e.g., Allibone v. Tex. Med. Bd.*, No. A-17-CA-00064-SS, 2017 WL 4768224, at * 3 (W.D. Tex. Oct. 20, 2017) (order) (finding "clear articulation" test was met where state broadly authorized the Texas Medical Board to regulate the practice of medicine). Authority to adopt rules as necessary to regulate an industry "includes the power to adopt rules that may have anticompetitive effects." *Earles v. State Bd. of Certified Pub. Accts. of La.*, 139

8

F.3d 1033, 1044 (5th Cir. 1998). Anticompetitive rules were thus a foreseeable result of the State's explicit grant of broad authority to the Board to regulate each phase of the bonding business and to adopt rules as necessary to implement the statute. *See Phoebe Putney Health Sys.*, 568 U.S. at 227; *see, e.g.*, *Earles*, 139 F.3d at 1043 (anticompetitive effect was foreseeable result of statute authorizing board to adopt and enforce all rules necessary to regulate the practice of public accounting in the state).[4] Accordingly, the Board adopted the 10% Rule pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition. *Midcal*, 445 U.S. at 105.

Claiborne advances several sub-arguments that attempt to avoid the broad authority granted to the Board for which anticompetitive rules were the foreseeable effect. The thrust of each is that the state has not evinced an intent to displace competition. For instance, she argues that the state has not articulated a policy to displace competition because the state does not require less-populous counties to form bail bond boards. *See* Tex. Occ. Code Ann. §§ 1704.051–.052. However, *Parker* state-action immunity does not require uniformity in the state's policy. *See, e.g., Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*, 760 F.2d 607, 611 (5th Cir. 1985) (concluding that a statute applicable only to home-rule cities nonetheless expressed a policy to displace competition, allowing airport taxicab services to be granted to a single company). Claiborne next contends that because felony detainees are entitled to a personal recognizance or reduced bond after ninety days if the state is not ready for trial, the state's intent is to facilitate pretrial

---

[4] In addition to *Phoebe Putney Health System*, Claiborne cites *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 790–91 (1975), involving a minimum fee schedule issued by a county bar association, in her argument that the Board is not entitled to state-action immunity. After *Goldfarb*, the Supreme Court clarified the approaches applicable for state-action immunity for non-state actors in *Midcal* (non-state actors controlled by market participants) and *Hallie* (non-state actors that are not market participants or controlled by market participants). *See Dental Exam'rs*, 574 U.S. at 506–08 (discussing same).

9

release. *See* Tex. Code Crim. Proc. Ann. art. 17.151. This statute was the legislature's solution to the indefinite detention of an uncharged person for an offense that the prosecution is not ready to bring to trial. *Ex Parte Gill*, 413 S.W.3d 425, 432 (Tex. Crim. App. 2013). It does not address regulation of the bail bonds industry or breadth of the authority granted to the Board.

Claiborne also compares bail bondsmen with charitable bail organizations. She contends the state's policies would not simultaneously make it more difficult and costly for a consumer to make bail through a bail bondsman under the 10% Rule while also allowing "easier" and "free" bail through a charitable bail organization. Bail bondsmen and charitable bail organizations both assure full payment of the amount of bail to the county if the criminal defendant fails to appear for subsequent proceedings, albeit under different financial requirements. Although the record does not reflect the ease or difficulty a criminal defendant may encounter in obtaining bail from a charitable bail organization, unlike a bail bondsman, a charitable bail organization must post the full amount of the defendant's bail upfront. *See* Tex. Code Crim. Proc. Ann. art. 17.071(a). A charitable bail organization is also prohibited from accepting a premium or compensation for paying the bail of a criminal defendant. *See id.* art. 17.071(j). Conversely, a bail bondsman acts as a surety and does not post the full amount of a defendant's bail upfront. *See generally id.* art. 17.02 (defining "bail bond" as a written undertaking by a defendant and a defendant's sureties); Tex. Occ. Code Ann. § 1704.001(2) (defining bail bond surety). A bail bondsman charges a criminal defendant a premium—generally a non-refundable percentage of the amount of bond—before posting a bond for the defendant. Thus, to the extent obtaining bond from a bail bondsman is "harder" and "more expensive" than charitable bail, this circumstance exists even without the 10% Rule. Claiborne's

comparison of the two is therefore unavailing.

Because the Board's authority meets the test for "a clearly articulated and affirmatively expressed" state policy to displace competition, we conclude that the Board is entitled to *Parker* state-action immunity for its adoption of the 10% Rule. We overrule Claiborne's first issue.

## C.    ULTRA VIRES

In her second issue, Claiborne argues that that the Board's adoption of the 10% Rule exceeds the powers of the Bail Bond Act and is thus *ultra vires*. She avers that the 10% Rule prohibits payment plans with a bail bondsman, while the Bail Bond Act provides for them. An agency may adopt only such rules as authorized by and consistent with its statutory authority. *Pruett*, 249 S.W.3d at 452. This authority may be express or implied from other powers and duties given or imposed by statute. *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992). "'The only requirement is that an agency's rules must be consistent with the laws of this state.'" *Id.* (quoting *Stein*, 771 S.W.2d at 577). The determining factor is whether the rule is in harmony with the general objectives of the act involved. *Pruett*, 249 S.W.3d at 452. We thus examine the provisions of the Bail Bond Act in deciding whether a particular administrative agency has exceeded its rule-making powers. *See id.*

In support of her argument, Claiborne specifically cites sections 1704.202(b)(5)(A)(i) and 1704.301(2)(A) of the Bail Bond Act as contemplating payment plans. *See* Tex. Occ. Code Ann. §§ 1704.202(b)(5)(A)(i) (stating that the bail bondsman shall maintain records to include "a statement of: (A) whether the security held by the [bail bondsman] is: (i) for the payment of a bail bond fee"); 1704.301(2)(A) (addressing when a bail bond surety must return security, including at the conclusion of the payment agreement). We address the plain and

common meaning of a statute when ascertaining legislative intent. *Pruett*, 249 S.W.3d at 454. From a plain reading of these statutes, we agree these sections contemplate payment plans and the Bail Bond Act thus permits them. However, nothing in these sections expressly or impliedly mandates payment plans. *See* §§ 1704.202(b)(5)(A)(i), 1704.301(2)(A). Moreover, the language of the 10% Rule itself contains no prohibition of payment plans.[5]

As we have previously discussed, the Texas Supreme Court has concluded that the Bail Bond Act confers "broad regulatory powers on the Board" in expressly authorizing it to "supervise and regulate each phase of the bonding business." *Pruett*, 249 S.W.3d at 452–53. Like *Pruett*, "[h]ere, the scope of the Board's explicit power is unambiguously broad," *id*. at 453, and Claiborne has not pointed to a section of the Bail Bond Act that makes the 10% Rule an impermissible area of agency rulemaking. We conclude that the Board has not exceeded its authority under the Bail Bond Act in adopting the 10% Rule. We overrule issue two.

**D.    SEPARATION OF POWERS**

In her third issue, Claiborne argues that the 10% Rule violates the separation of powers doctrine because the rule's requirements impose a condition of bail, which is the province of the judiciary. The Texas Constitution's Separation of Powers Clause provides, in pertinent part:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confined to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another; and those which are

---

[5] It appears from the rules and statutes cited by the parties that a criminal defendant affected by the 10% Rule can make installment payments and provide non-monetary security to the bondsman, but until that defendant's installments amount to ten percent of the bail set by the trial court or magistrate, the bondsman may not post bond.

> Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

Tex. Const. art. II, § 1. This division ensures that power granted to one branch may be exercised only by that branch, to the exclusion of others. *Ex parte Lo*, 424 S.W.3d 10, 28 (Tex. Crim. App. 2013). It reflects a belief that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government. *Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Crim. App. 1990). The separation of powers clause may be violated in two ways. *Ex parte Giles*, 502 S.W.2d 774, 780 (Tex. Crim. App. 1973). First, it is violated when one branch of government assumes, or is delegated, a power that is more "properly attached" to another branch. *Id*. The provision is also violated when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers. *Armadillo Bail Bonds*, 802 S.W.2d at 239.

Claiborne cites an appeal in which a bail bondsman successfully challenged a bail bond board's local rule under a separation of powers argument. *Black v. Dallas Cnty. Bail Bond Bd.*, 882 S.W.2d 434, 439 (Tex. App.—Dallas 1994, no writ). In *Black*, the contested local rule required sureties to pay the sheriff for the costs of re-arresting a criminal defendant who forfeited bond and allowed the sheriff to finally decide the amount of such re-arrest costs. *Id.* at 439. The local rule ran afoul of the separation of powers doctrine because it usurped the judiciary's power to adjudicate the reasonable amount of re-arrest costs and enter a final judgment, which were inherent in the statutes under which a surety could seek return of a forfeited bond less costs. *See id.* (citing Tex. Code Crim. Proc. Ann arts. 22.16(a) (remittitur after forfeiture), 22.17(a) (special bill of review in bond

forfeiture proceeding)). Claiborne argues that the same reasoning applies here: it is the judiciary's power under the Texas Code of Criminal Procedure to set the amount and conditions of bail, and the Board has usurped that power.

Claiborne's argument that the 10% Rule imposes a condition of bail is not persuasive. Article 17.15 of the Code of Criminal Procedure places the responsibility for determining the amount of bail[6] and any conditions of bail with "the court, judge, magistrate, or other officer taking the bail." Tex. Code Crim. Proc. Ann. art. 17.15. However, the judiciary has not been empowered to specify that a criminal defendant must post a cash bond or a surety bond to the exclusion of the other. *See Ex parte Deaton*, 582 S.W.2d 151, 153 (Tex. Crim. App. 1979). Nor does the judiciary have the discretion to allow a criminal defendant to make a cash deposit that is a discount of or percentage of the face amount of bail. *See Pro. Bondsmen of Tex. v. Carey*, 762 S.W.2d 691 (Tex. App.—Amarillo 1988, no writ) (concluding that trial court had no discretion "to set a differential bail bond amount depending upon whether a cash bond or a surety bond is used."); *accord In re Tharp*, 351 S.W.3d 598, 600 (Tex. App.—Austin 2011, orig. proceeding) (concluding that trial court erred in allowing a defendant to deposit cash in the amount of ten percent of the bond). Lacking such power, it follows that the judiciary also lacks the power to order a criminal defendant to pay any specific percentage of bail to obtain a surety bond.

The Board argues that fundamentally, the 10% Rule has nothing to do with the amount or conditions of bail. Rather, it regulates the bondsman and the

---

[6] Among the rules the court considers in setting the amount of bail is the defendant's ability to make bail. *Id*. Because the right to be free from excessive bail is protected by the United States and Texas Constitutions, a criminal defendant may challenge excessive bail and the conditions of bail in an application for writ of habeas corpus. *See, e.g., Ex parte Dupuy*, 498 S.W.3d 220, 235 (Tex. App.—Houston [14th Dist.] 2016, no pet); *Ex parte Durst*, 148 S.W.3d 496 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

premium that the bondsman must collect. We agree that the 10% Rule is not a condition of bail, and we conclude that the Board has not violated the separation of powers doctrine in adopting the 10% Rule. We overrule issue three.

## III. CONCLUSION

To prevail on her application for temporary injunction, Claiborne was required to prove that she has a probable right to the relief sought. *See Butnaru*, 84 S.W.3d at 204. In reviewing the trial court's denial of her requested temporary injunction, Claiborne did not meet this standard. We conclude that the Board is entitled to state-action immunity in the anti-trust context for its adoption of the 10% Rule; that the Board's adoption of the 10% Rule was not an *ultra vires* act; and that the 10% Rule does not violate the separation of powers doctrine. Accordingly, the trial court's denial of a temporary injunction did not constitute an abuse of discretion or a failure to correctly apply the law to undisputed facts. *See Manning*, 474 S.W.2d at 449. Having overruled Claiborne's issues, we affirm the decision of the trial court.

/s/    Margaret "Meg" Poissant
         Justice

Panel consists of Justices Bourliot, Hassan, and Poissant.